IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANTOINE N. WATIE,

               Petitioner,                  No. CIV S-04-CV-1289 FCD CHS P

    vs.

TOM L. CAREY,

               Respondent.           __FINDINGS AND RECOMMENDATIONS__

_____/

I.      INTRODUCTION

        Petitioner, Antoine N. Watie, is a state prisoner proceeding through counsel with a petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving an indeterminate sentence of twenty-five years to life and a concurrent sentence of seven years following his convictions by jury trial in the Sacramento County Superior Court, Case No. 99F03710, for voluntary manslaughter, discharging a firearm into an inhabited dwelling, discharge of a firearm resulting in death or great bodily injury, and commission of an offense while released on bail.  With this petition, Petitioner challenges the constitutionality of those convictions.  Specifically, Petitioner claims that:

        (1) Imposition of a life sentence based upon a firearm enhancement constitutes cruel and unusual punishment, in violation of his Eighth Amendment rights.

1

(2) The statutory scheme under which he was convicted and sentenced violates the Equal Protection Clause of the Fourteenth Amendment because it allows him to be sentenced as though he had been found guilty of murder, a crime for which he was acquitted by the jury.

(3) Insufficient evidence supports his conviction for maliciously and willfully discharging a firearm at an inhabited dwelling because the jury acquitted him of murder, thereby negating a finding of malice.

(4) The trial court erroneously issued a jury instruction on the victim's right to defend his property, and failed to issue jury instructions on a mistake of fact defense and on self-defense in the context of sections 246 and 12022.53(d) of the California Penal Code.

(5) The California Legislature did not intend for section 12022.53(d) of the California Penal Code to apply to cases where a jury finds a defendant acted in imperfect self-defense.

(6) His appellate counsel rendered prejudicially ineffective assistance for failing to exhaust his claims that (a) his conviction under section 246 of the California Penal Code was supported by insufficient evidence; (b) the trial court violated his due process rights by instructing the jury on the victim's right to defend his property; and (c) the trial court violated his due process and Sixth Amendment rights by failing to instruct the jury regarding a mistake of fact defense.

(7) Antiterrorism and Effective Death Penalty Act of 1996 violates the Separation of Powers doctrine.

Upon careful consideration of the record and applicable law, it is recommended that this petition for writ of *habeas corpus* relief be denied.

## II.    FACTUAL BACKGROUND

The basic facts of Petitioner's crimes were summarized in the partially published opinion[1] of the California Court of Appeals, Third Appellate District, as follows:

Anita Devonn Thompson-Lee (Thompson) lived with her husband, James Lee, and their five-year-old son and four-year-old daughter. Thompson had known Lee for 20 years and had been married to him since 1994.  Defendant is Thompson's, but not Lee's, son.

Lee had seven prior convictions for armed robberies and kept two rifles in the home.

While Lee was in prison, defendant lived at home with Thompson.

---

[1]The appellate court's opinion in *People v. Antoine Nathaniel Watie*, No. C035402, was lodged in the record as Document 5 on March 24, 2005.

Lee returned when defendant was 13, and defendant moved out of the home in favor of Thompson's mother's home.  Defendant testified Lee mistreated him and defendant's younger brother, Darron Brown, while they lived with Lee and that, once during a dispute, Lee pulled out a sawed-off shotgun and pointed it at defendant.  Defendant testified that he was afraid of Lee and that he often saw bruises and scratches on his mother after she visited defendant.

Thompson did not want her other son, Darron Brown, to live with her, because Lee physically and mentally abused Brown, too.  Brown testified Lee beat him with a leather belt in 1998 and punched him in the nose in 1999.  Because Lee beat and threatened Brown, Brown left his mother and Lee's home and moved in with his grandmother.

On the night of Lee's death, Thompson told the investigating detective that she did not believe Lee was abusive.

Defendant's aunt, Felicia Rule, testified Lee had become progressively more negative toward Thompson in the year prior to Lee's death and that he treated Thompson in a derogatory and demeaning manner.  Two witnesses testified to incidents in which Lee had beaten Thompson.  Thompson and Lee's problems worsened after Lee's own son died in a car accident in July 1998.

On the afternoon of May 5, 1999, Thompson and Lee got into an argument in their living room.  During the argument, Lee knocked a plate out of Thompson's hand and it hit their five-year-old son.  Lee punched and slapped Thompson in the face and tried to hold her down on the couch.  When Thompson tried to hit Lee with a wooden statue, Lee took it away and began hitting Thompson on the head with it.

After the fight, Thompson called her sister, Lolita Thompson, (we shall use Lolita Thompson's first name for the sake of clarity) and asked Lolita to come get her.  Lee was screaming and cursing at Thompson as Thompson left for her mother's house.

Lee's neighbor, David Medlin, saw Lee as he tried to prevent Thompson from leaving.  Medlin spoke with Lee for about 15 or 20 minutes; Lee had calmed down by the end of the conversation.

At her mother's home, Thompson saw defendant and two of his friends – David Towner and Jermain Williams.  Thompson's face was bloody and she told defendant what had happened and told him Lee would not let her take her children.  Defendant told Thompson to call the police and asked Thompson if she wanted her children.  Thompson said she did.

Defendant and his friends left to go shopping.  At one point, Williams told defendant and Towner that they should go beat up Lee and give him a taste of his own medicine.  Defendant testified that no one

discussed this comment, or took it seriously.  Thereafter, defendant dropped off Williams at his house, and defendant and Towner went to defendant's girlfriend's house to watch television.

About an hour after her fight with Lee, Thompson called the police. During the 911 telephone call, Thompson told the 911 operator Lee had no weapons in the house.

Sacramento City Police Officer Charles Gomez responded to the 911 call at 8:11 p.m.  Thompson told Gomez she had been the victim of domestic violence, but Gomez testified he did not see any injuries on Thompson, nor did she tell him of any.  Thompson told Gomez defendant might get upset, although Gomez did not follow up on her warning.

Thompson asked Gomez to retrieve her children from Lee, but Gomez told her he could not, because Thompson and Lee were married and the children were his, too.  Gomez told Thompson she needed to resolve any custody issues in court.

Thompson called Lee that night.  At trial she testified Lee was not calm and was acting "kind of paranoid."  On the night of the murder, however, Thompson told the investigating detective Lee was "kind of normal."

After Gomez left, Thompson and defendant spoke by telephone. Thompson told defendant the police would not pick up her children, and defendant again asked Thompson if she wanted them.  Thompson testified she told defendant not to get the children although defendant testified he told Thompson that he would come and pick her up and take her to Lee's house to get them.  Before he left his apartment, defendant put a gun in his back pocket.

Defendant and Towner picked up Williams, went to a store for cigarettes, and returned to Thompson's mother's house.  According to defendant, Thompson decided not to go with defendant, but defendant told her that he would go get her children anyway.

Defendant, Towner and Williams went to Lee's home, parked in front of the house, and went to the front door.  Williams tried to open the security door but found it was locked.  The interior door, however, was open and they could see inside.

Lee jumped up from the couch and came to the door.  Williams and Lee started arguing and Williams challenged Lee to come outside. Lee told the men they should leave if they did not want any problems. Defendant told Lee he was there to pick up his stepbrother and stepsister; Lee said he would not let defendant take the children.

Their conversation was heated and, at one point, Lee went back into the room and reached under the couch.  Williams thought Lee was

4

going to get a pistol and he and Towner backed away from the door. Defendant saw that Lee had merely grabbed his shoes from behind the couch and defendant stayed where he was.

Defendant continued to argue with Lee. Williams testified Lee told defendant that Lee was going to "whip his ass," and defendant told Lee to come outside, but defendant denied challenging Lee to fight. Defendant did threaten to have Lee sent back to prison.

Williams and defendant then watched Lee go to the back of the house and defendant thought Lee was going to get the children. Williams could see only Lee's shadow when Lee returned; he thought Lee had a rifle, or a shotgun, in his hands. Williams shouted, "he's got a gun, he's got a gun" and retreated to the car.

Defendant testified he saw a rifle, or a shotgun, in Lee's hands and saw him raise it toward him. He thought Lee was going to kill him. Defendant reached into his back pocket, pulled out his gun, closed his eyes, and fired at Lee. Defendant ran from the door halfway to the car, walked the rest of the way, and then drove off.

In the car after the shooting, Williams thought defendant told him Lee had a gun. Defendant also said something to the effect of "Damn, I shot the fool." Defendant claimed he did not turn himself in to the police because he was scared.

Thompson's mother received a telephone call from Thompson's five-year-old-son, who asked her to come pick him up. Thompson went home and found the police there and her children at a neighbor's house. The five-year-old boy told his mother that defendant and Lee were arguing, he heard a "boom boom," and then saw Lee lying on the floor.

After his daughter told him she heard gunshots, Medlin, the neighbor, went to Lee's house to investigate. He saw the two young children in the dining room. They told him their dad was on the floor and there was blood everywhere. The little boy unlocked the door and let Medlin in; Medlin saw Lee face down on the floor. Medlin was positive he observed the butt of a Winchester rifle under Lee's body. He made sure that no one touched anything in the room until the police arrived.

Another neighbor, Annie Bravo, heard the gunshots. She, too, went to Lee's house to investigate and saw the metal of a gun barrel sticking out from underneath Lee's body. A third neighbor, John Yardell, also testified he saw something that looked like the barrel of a gun under Lee's body.

Sacramento Police Officer Gary Wohlgemuth heard the gunshots and arrived on scene in less than 10 minutes (approximately 9:31 p.m.). Wohlgemuth saw Lee's body on the floor. He did not see any guns

5

but did see a small statue protruding from beneath Lee's body.

When paramedic Jesse Beltran arrived at 9:34 p.m., Lee was dead. Beltran remembered a wooden object underneath Lee but did not observe any guns around his body.

Sacramento Police Detective William Harrison arrived at the scene of the shooting at 10:23 p.m.  He saw two bullet holes in Lee's chest and four bullet holes in the security door.  The officer identified a small wooden African-style statue that was located near Lee's body, but the police did not collect that item as evidence.  The two rifles that Lee owned were not found in the home.

(Lodged Doc. 5 at 2-9).

Defendant was charged with second degree murder (CAL. PENAL § 187(a)) with a penalty enhancement for the use of a firearm (CAL. PENAL § 12022.5(a)(1)), and discharging a firearm at an inhabited dwelling (CAL. PENAL § 246).  As to both charges, the state also sought a penalty enhancement for intentional and personal discharge of a firearm causing great bodily injury (CAL. PENAL § 12022.53(d)).  Finally, the state sought a penalty enhancement for committing a felony while released on bail for a prior felony (CAL. PENAL § 12022.1(b)).

Following a jury trial, Petitioner was acquitted of first and second degree murder. He was, however, convicted of the lesser included offense of voluntary manslaughter (CAL. PENAL § 192), and the jury found true the penalty enhancement for use of a firearm (CAL. PENAL § 12022.5(a)(1)).  The trial court stayed Petitioner's sentence as to the manslaughter conviction and enhancement pursuant to section 654(a) of the California Penal Code, which provides that an act "punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act...be punished under more than one provision."

The jury also convicted Petitioner for discharging a firearm at an inhabited dwelling (CAL. PENAL. § 246), and found true the penalty enhancement for intentionally and personally discharging a firearm causing great bodily injury (CAL. PENAL § 12022.53(d)).  Accordingly, the trial court sentenced Petitioner to five years imprisonment plus twenty-five years to life

1   imprisonment with the possibility of parole.  In addition, Petitioner received a penalty enhancement

2   of two years imprisonment for commission of a felony while released on bail (CAL. PENAL §

3   12022.1(b)), to which he had entered an admission prior to trial.  All terms of imprisonment were

4   to run consecutively.

5   III.    PROCEDURAL HISTORY

6          Petitioner timely appealed his convictions to the California Court of Appeal, Third

7   Appellate District.  The appellate court affirmed his convictions in a reasoned opinion on July 30,

8   2002.  Petitioner then sought review of his convictions in the California Supreme Court.  That

9   petition was denied without comment on October 23, 2002.  Petitioner next sought *habeas corpus*

10  relief in the Sacramento County Superior Court.  His petition was denied by reasoned opinion on

11  November 25, 2003.  Petitioner subsequently filed *habeas corpus* petitions in the California Court

12  of Appeal, Third Appellate District, and the California Supreme Court.  Both were denied without

13  comment.  Petitioner filed this federal petition for writ of *habeas corpus* on July 6, 2004.

14  Respondent filed an answer on March 22, 2005.  Petitioner filed his traverse on November 8, 2005.

15  IV.    APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

16         This case is governed by the provisions of the Antiterrorism and Effective Death

17  Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of *habeas corpus* filed after

18  its enactment on April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114

19  F.3d 1484, 1499 (9th Cir. 1997).  Under AEDPA, an application for a writ of habeas corpus by a

20  person in custody under a judgment of a state court may be granted only for violations of the

21  Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362,

22  375 n. 7 (2000).  Federal *habeas corpus* relief is not available for any claim decided on the merits

23  in state court proceedings unless the state court's adjudication of the claim:

24             (1) resulted in a decision that was contrary to, or involved an
               unreasonable application of, clearly established federal law, as
25             determined by the Supreme Court of the United States; or

26             (2) resulted in a decision that was based on an unreasonable

7

determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Although "AEDPA does not require a federal habeas court to adopt any one methodology," *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003), there are certain principles which guide its application.

First, AEDPA establishes a "highly deferential standard for evaluating state-court rulings." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Accordingly, when determining whether the law applied to a particular claim by a state court was contrary to or an unreasonable application of "clearly established federal law," a federal court must review the last reasoned state court decision. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Provided that the state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no matter how brief. *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232 F.3d 1031, 1035 (9th Cir. 2000). Conversely, when it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, AEDPA's deferential standard does not apply and a federal court must review the claim *de novo*. *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Second, "AEDPA's, 'clearly established Federal law' requirement limits the area of law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme Court decisions." *Robinson*, 360 F.3d at 155-56 (citing *Williams*, 529 U.S. at 381). In other words, "clearly established Federal law" will be " the governing legal principle or principles set forth by [the U.S. Supreme] Court at the time a state court renders its decision." *Lockyer*, 538 U.S. at 64. It is appropriate, however, to examine lower court decisions when determining what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. *See Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000).

Third, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meanings." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause,

a federal court may grant a writ of *habeas corpus* only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405.  It is not necessary for the state court to cite or even to be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).  Moreover, a state court opinion need not contain "a formulary statement" of federal law, but the fair import of its conclusion must be consistent with federal law. *Id*.

Under the "unreasonable application" clause, the court may grant relief "if the state court correctly identifies the governing legal principle...but unreasonably applies it to the facts of the particular case." *Bell*, 535 U.S. at 694.  As the Supreme Court has emphasized, a court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 410.  Thus, the focus is on "whether the state court's application of clearly established federal law is *objectively* unreasonable." *Bell*, 535 U.S. at 694 (emphasis added).

Finally, the petitioner bears the burden of demonstrating that the state court's decision was either contrary to or an unreasonable application of federal law. *Woodford*, 537 U.S. at 24 ; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

V.     DISCUSSION

1.     CRUEL & UNUSUAL PUNISHMENT

Petitioner is currently serving an aggregate sentence of 32 years to life with the possibility of parole.  Petitioner claims that the "barbaric" imposition of what he considers to be a life sentence based upon a firearm enhancement for conduct found by a jury to be a partially justified homicide is constitutionally impermissible because it constitutes cruel and unusual punishment, in

violation of his Eighth Amendment rights.[2]   According to Petitioner, he was sentenced on a "less serious offense," yet he received a punishment far harsher than his manslaughter conviction alone would have permitted.   Therefore, Petitioner argues that his sentence is constitutionally disproportionate to his crime.

A criminal sentence that is not proportionate to the crime for which a petitioner was convicted may violate the Eight Amendment.   *Harmelin v. Michigan*, 501 U.S. 957 (1991).  Outside of the capital punishment context, however, the Eighth Amendment " does not require strict proportionality between crime and sentence.   Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 1001 (1991) (quoting *Solem v. Helm*, 463 U.S. 277, 288, 303 (1983)).  *See also United States v. Bland*, 961 F.2d 123, 129 (9th Cir. 2002).  Successful challenges to the proportionality of particular sentences are, therefore, "exceedingly rare." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (citing *Harmelin*, 501 U.S. at 1001; *Solem*, 463 U.S. 277 at 290; *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)).   In addition, the burden of demonstrating that a sentence is grossly disproportionate to a crime is significant.   As a general rule, a "punishment within legislatively mandated guidelines is presumptively valid." *United States v. Mejia-Mesa*, 153 F.3d 925, 930 (9th Cir. 1998).  *See also United States v. McDougherty*, 920 F.2d 569, 576 (9th Cir.

---

[2] In addition to disputing its validity, Respondent alleges that Petitioner has failed to exhaust this claim, as well as several others.  The exhaustion of available state remedies is a prerequisite to a federal court's granting of a petition for *habeas corpus* under 28 U.S.C. § 2254(b)(1).  A petitioner may satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider all claims before presenting them to the federal court.  *Picard v. Connor*, 404 U.S. 270, 276 (1971); *Middleton v. Cupp*, 768 F.2d 1083, 1086 (9th Cir. 1986).  Generally, it is "not enough that all the facts necessary to support the federal claim were before the state courts . . . or that a somewhat similar state law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982).

Unexhausted claims may nonetheless "be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).  A federal court considering a *habeas corpus* petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable." *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).  Notwithstanding Petitioner's alleged failure to fully exhaust certain claims, this report will recommend that federal *habeas corpus* relief be denied on the merits of those claims because they are not "colorable" and Petitioner is not entitled to relief.

1990) (holding that "so long as the sentence imposed by the state court does not exceed statutory maximums, it will not be overturned on Eighth Amendment grounds."). This is because, as the Supreme Court has recognized, although they remain subject to the overriding provisions of the United States Constitution, "the primary responsibility for defining crimes against state law and fixing punishments for the commission of those crimes . . . rests with the States." *Payne v. Tennessee*, 501 U.S. 808, 824 (1991). The Eighth Amendment "gives legislatures broad discretion to fashion a sentence that fits within the scope of the proportionality principle." *See also Ewing v. California*, 538 U.S. 11, 24 (2003) ("A sentence can have a variety of justifications, such as incapacitation, deterrence, retribution, or rehabilitation. Some or all of these justifications may play a role in a State's sentencing scheme. Selecting the sentencing rationales is generally a policy choice to be made by state legislatures, not federal courts." (internal citations omitted)).

The sentence imposed upon Petitioner in this case, while undeniably harsh, does not fall within the type of "exceedingly rare" circumstance that would support a finding that his sentence violates the Eighth Amendment. As an initial matter, Petitioner's sentence does not exceed the statutory maximum for his crimes as determined by the California legislature. By statute, Petitioner's conviction for discharging a firearm at a dwelling carries a penalty of either three, five or seven years imprisonment, and Petitioner received five years on this charge. CAL. PENAL § 246. In addition, Petitioner's sentence was enhanced under section 12022.53(d) of the California Penal Code, which provides that a person convicted under section 246 who "personally and intentionally discharges a firearm and proximately causes...death [] to any person other than an accomplice [] shall be punished by an additional and consecutive term of imprisonment in the state prison for twenty-five years to life." Lastly, Petitioner was sentenced to an additional two years for committing a felony while released on bail. CAL. PENAL § 12022.1(b). As discussed above, a sentence imposed within legislatively mandated guidelines is presumed valid.

Furthermore, while Petitioner argues that his sentence is disproportionate to his manslaughter conviction, he ignores that sentencing on his manslaughter conviction was actually

stayed under CAL. PENAL § 654(a).  In fact, the sentence Petitioner currently challenges was imposed on his conviction for discharging a firearm at an inhabited dwelling,  CAL. PENAL § 246, and his penalty enhancements on that underlying conviction for causing a death, CAL. PENAL § 12022.53(d), and for committing a felony while released on bail, CAL. PENAL § 12022.1(b).

Moreover it is clear that the California legislature contemplated whether the penalty enhancements detailed in section 12022.53 of the California Penal Code should apply to convictions for voluntary manslaughter committed in imperfect self-defense, and concluded that they should. The appellate court discussed extensively the legislative history of section 12022.53(d) as follows:

"The touchstone of statutory interpretation is the probable intent of the Legislature.  When interpreting a statute, we must ascertain legislative intent so as to effectuate the purpose of a particular law. Of course our first step in determining that intent is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citation.] When the words are clear and unambiguous, there is no need for statutory construction or resort to other indicia of legislative intent, such as legislative history. [Citation.] But language that appears unambiguous on its face may be shown to have a latent ambiguity; if so, a court may turn to customary rules of statutory construction or legislative history for guidance."

The language of section 12022.53, subdivision (1) is clear.  It states: "The enhancements specified in this section shall not apply to the lawful use or discharge of a firearm by a public officer, as provided in Section 196, or by any person in lawful self-defense, lawful defense of another, or lawful defense of property, as provided in Sections 197, 198, and 198.5." (§ 12022.53 subd. (1).)  This subdivision, on its face, exempts lawful (perfect) self-defense from the section's application.  It does not exempt imperfect self-defense.

Defendant traces the history of Assembly Bill No. 4, (1997-1998 Reg. Sess.), which was ultimately enacted as section 12022.53. (Stats. 1997, ch. 503, § 3.)  In its original version, Assembly Bill No. 4 applied to manslaughter, and set forth no exemption for self defense.  (Assem. Bill No. 4 (1997-1998 Reg. Sess.) as introduced Dec. 2, 1996.)  The bill was amended on February 19, 1997 to include an exemption to its application for lawful self-defense. (Assem. Amend. to Assem. Bill No. 4 (1997-1998 Reg. Sess.) Feb. 19, 1997.)

Thereafter, an Assembly Committee Report, which discusses the amended bill, noted that the bill, as written, would apply the provisions of the new law where the charge of voluntary manslaughter was the result of a jury finding that a defendant had

killed another while acting in "imperfect self-defense." (Assem. Com. on Public Safety, Assem. Bill No. 4 (1997-1998 Reg. Sess.) Apr. 8, 1997.) That same report also noted that, as written, the law "could also apply in homicides committed by battered wives, as an intentional killing done in response to non-imminent danger is, at least, manslaughter." (Assem. Com. on Public Safety, Assem Bill No. 4 (1997-1998 Reg. Sess.) Apr. 8, 1997) Finally, the report concluded that the bill, as written, "could also apply where a shopkeeper who [sic] uses deadly force in honest belief that a person had come into his shop to rob and kill him or her." (Assem. Com. on Public Safety, Assem. Bill No. 7 (1997-1998 Reg. Sess.) Apr. 8, 1997.)

Following that report, the bill was amended to include imperfect self-defense. (Assem. Amend. to Assem. Bill No. 4 (1997-1998 Reg. Sess.) Apr. 9, 1997.) After a number of other amendments that shed no light on this subject, the Senate amended Assembly Bill No. 4 to exclude from its provisions the crime of voluntary manslaughter and the concept of imperfect self-defense. (Sen. Amend. to Assem. Bill No. 4 (1997-1998 Reg. Sess.) Sept. 20, 1997.) Curiously, because perfect self-defense operates as a complete defense to the underlying crime so that there would be no conviction to which the enhancement would attach if the defense were established, the bill continued the exception for lawful self-defense. But it also continued to provide that the enhancement applied to those convicted of a violation of section 246.

From the legislative history, defendant concludes the Legislature never intended for the enhancement to apply to people who commit the qualifying crime while acting in either lawful (perfect), or unlawful (i.e. imperfect), self-defense. On the first point we agree; the statute expressly, if perhaps unnecessarily, provides that self-defense prevents application of the enhancement. As to the second point, the legislative history demonstrates the Legislature was acutely aware of the interplay between manslaughter and imperfect self-defense. The Legislature's use of perfect and imperfect self-defense in the various versions of the statute demonstrates it knew how to include and exclude those concepts when it so chose. If the Legislature did not want the statute to apply in those cases where a defendant committed a violation of section 246 while acting with an actual, but unreasonable, belief in the need to defend himself, it was capable of writing this statute to say so. It did not. We will not rewrite this statute to include that which the Legislature chose to leave out.

(Lodged Doc. 5 at 25-28). As the United States Supreme Court has recognized, a significant amount of deference should be afforded to the states in defining crimes against state law and determining corresponding punishments.

13

Lastly, Petitioner's sentence is not inconsistent with federal law as set forth in the decisions of the United States Supreme Court noted above.  Indeed, the United States Supreme Court and the Ninth Circuit have upheld similar sentences for less violent crimes.  *See Andrade*, 538 U.S. at 63 (upholding a third strike sentence of two consecutive terms of twenty-five years to life imprisonment for two petty theft convictions); *Ewing*, 538 U.S. at 11 (upholding a third strike sentence of twenty-five years to life imprisonment for a theft of three golf clubs from a pro shop); *Harmelin,* 501 U.S. at 1009 (upholding a mandatory life sentence for a first offense possession of 672 grams of cocaine); *Rios v. Garcia*, 390 F.3d 1082) (9th Cir. 2004) (upholding a third strike sentence of twenty-five years to life for the theft of two watches having a combined value of $79.98); *United States v. Van Winrow*, 951 F.2d 1069 (9th Cir. 1991) (upholding a life sentence without the possibility of parole for possession of cocaine with intent to distribute).  Conversely, Petitioner was convicted and sentenced for personally and intentionally discharging a firearm into a dwelling resulting in a death, without question a violent offense.  Petitioner has failed to demonstrate that his sentence is grossly disproportionate to his crime of conviction, and is thus not entitled to *habeas corpus* relief on this claim.

    2.    EQUAL PROTECTION

Petitioner challenges his sentence on the grounds that it is disproportionate to sentences of other similarly situated individuals convicted of armed manslaughter.  Specifically, Petitioner challenges the applicability of the penalty enhancement set forth in section 12022.53(d) of the California Penal Code to his conviction for discharging a firearm into an occupied dwelling, in violation section 246 of the Penal Code.  Petitioner contends that the statutory scheme under which he was convicted and sentenced cannot survive rational basis review because it allowed him to be sentenced as if he had been convicted for murder, despite his acquittal by the jury on that charge.  Petitioner thus claims that his sentence violates the Equal Protection Clause of the Fourteenth Amendment.  U.S. CONST. AMEND. XIV, § 1.

The Equal Protection Clause "commands that no State shall 'deny to any person

14

within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  Under the Equal Protection Clause, therefore, "the State must govern impartially." *McQueary v. Blodgett*, 924 F.2d 829, 834 (9th Cir. 1991).  Laws and rules that apply evenhandedly to all persons within a jurisdiction comply with the fundamental principles of equal protection.  *See id.* (citing *Jones v. Helms*, 452 U.S. 412, 4223 (1981)).

An individual challenging the constitutionality of a statute on equal protection grounds must demonstrate that he was treated in a manner disparate to a similarly situated class of individuals.  *San Antonio School District v. Rodreguez*, 411 U.S. 1, 30 (1972).  *See also Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995).  In addition, "[t]here must be an allegation of invidiousness or illegitimacy in the statutory scheme before a cognizable [equal protection] claim arises."  *McQueary v. Blodgett*, 924 F.2d 829, 835 (9th Cir. 1991).  This can be done either by demonstrating "that the law is applied in a discriminatory manner or [that it] imposes different burdens on different classes of people."  *Freeman*, 68 F.3d at 1187 (internal citation omitted).  Unless the alleged discrimination involves a suspect class of persons or a fundamental right, a challenged statute satisfies equal protection if it bears a rational basis to a legitimate governmental interest.  *See United States v. Klein*, 860 F.2d 1489 (9th Cir. 1988).  *See also City of New Orleans v. Dukes*, 427 U.S. 297 (1976) (Federal courts employ a strong presumption that governmental classifications do not violate the Equal Protection Clause unless they burden a suspect class or a fundamental interest).

Petitioner's claim that the penalty enhancements imposed upon his sentence under California Penal Code § 12022.53 violate equal protection must fail.  Simply because Petitioner could not have received the same sentence solely as a result of his manslaughter conviction is insufficient to demonstrate that his right to equal protection has been violated.  A statutory penalty enhancement applicable only to some crimes does not offend the rational basis standard of review simply because the legislature is aware of other crimes, but did not make them subject to the

enhancement.  *United States v. Clawson*, 831 F.2d 909, 915 (9th Cir 1987).

Moreover, in enacting section 12022.53 of the California Penal Code generally, the California legislature has determined that offenders who use firearms in the commission of certain enumerated felonies are a special class of criminals and should be punished more harshly than offenders who commit the same crimes without using a firearm. Petitioner was convicted for discharging a firearm into an inhabited dwelling in violation of section 246 of the California Penal Code, a crime which the California Legislature has specifically determined is subject to penalty enhancements under section 12022.53(d) when it results in death or injury to a victim.  On collateral review, the California Court of Appeal, Third Appellate District, explained the dangers inherent in a violation of section 246 that subject offenders to a penalty enhancement under the California Penal Code:

> The Legislature could have concluded, from the outset, that Penal Code § 246 is such a dangerous crime that it should be included for the Penal Code § 12022.53(d) enhancement, when great bodily injury or death is proximately caused by the discharge of the gun, even though voluntary manslaughter should not be so included.  Penal Code § 246 presents special dangers to society: whenever a person points a gun at any part of a house and pulls the trigger, the person risks there being anyone in the path of the bullet, whether the bullet travels through a wall into another room or ricochets off of a floor or wall or object, changes direction, and strikes someone not even seen by the person committing the shooting.

(Lodged Doc. 7 at 2).  Consequently, while a violation of section 246 will not always result in injury or death to a victim, in circumstances where injury or death does occur, the offender becomes subject to the penalty enhancements set forth in section 12022.53(d).

Petitioner claims incorrectly, therefore, that he is similarly situated only to other offenders convicted of armed manslaughter.  Petitioner stands convicted of an additional crime which, as noted above by the appellate court, presents special dangers to society, thus exposing him to enhanced penalties.  *See also People v. Hutchins*, 90 Cal.App.4th 1308, 1313 ("Clearly, in enacting [section 12022.53] the legislature intended to *mandate* the imposition of substantially increased penalties where one of a number of crimes . . . was committed by the use of a firearm.").

Petitioner has failed to demonstrate that other criminal defendants similarly situated to him were systematically treated better than he.  Nor has Petitioner demonstrated the absence of a rational basis for the statutory scheme under which he was convicted and sentenced.  The state's interest in punishing those who discharge individually and personally a firearm into an inhabited dwelling causing serious bodily injury or death to advance the legitimate goal of public safety provides a rational basis for the statute and thus avoids violation of the Equal Protection Clause.  *Rummel v. Estelle*, 445 U.S. 263, 276 (1980).  "The courts do not substitute their views about a statute's wisdom for that of [the legislature] unless the statute is arbitrary."  *Clawson*, 831 F.2d at 915. (citing *Flemming v. Nestor*, 363 U.S. 603, 611 (1960).  Petitioner is not entitled to *habeas corpus* relief on his equal protection claim.

### 3.     INSUFFICIENT EVIDENCE

Petitioner claims insufficient evidence supported his conviction under section 246 of the California Penal Code, which provides that "[a]ny person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house . . . is guilty of a felony."  According to Petitioner, the jury's determination that he acted in imperfect self-defense, thus finding him guilty of voluntary manslaughter and acquitting him of murder, negated a finding of malice.  Therefore, because the jury determined that he acted without malice, he could not have been found guilty of violating section 246, which requires the presence of malice.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  On *habeas corpus* review, sufficient evidence supports a conviction so long as, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  *See also Prantil v. California*, 843 F.2d 314, 316 (9th Cir. 1988).  "[T]he dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable

doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318). Indeed, the prosecution is not required to "rule out every hypothesis except that of guilt," and the reviewing court presumes that "even if it does not affirmatively appear in the record[,] that the trier of fact resolved any such conflicts in favor of the prosecution , and must defer to that resolution." *Wright v. West*, 505 U.S. 277, 296-97 (1992).   Accordingly, "[a] petitioner for a federal writ of *habeas corpus* faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."   *Juan H. V. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

Although Petitioner did not raise this exact claim on appeal, he did raise a directly related challenge to the trial court's failure to instruct the jury as to the proper definition of "malice." The California Court of Appeal, Third Appellate District, rejected Petitioner's claim, explaining that the element of "malice" required for murder is different from the "malicious" element that is required for a violation of section 246:

> Defendant first argues the court failed to properly define "malice" as the term is used in Penal Code section 246.  Defendant contends the court should have instructed the jury that the People had to prove the defendant "shot into the house without justification or excuse or with conscious indifference to or reckless disregard for the consequences."
>
> Section 246 is a general intent crime.  (*People v. Jischke* (1996) 51 Cal.App.4th 552, 556.)  As such, the term "maliciously" in section 246 is defined by Penal Code section 7, item 4, as "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law."   The court correctly instructed the jury on this point.
>
> Defendant cites *People v. Salcido* (1968) 263 Cal.App.2d 1, 6, for the proposition that the type of malice to which section 246 refers requires a demonstration that the act was without lawful "justification, excuse or mitigating circumstance."   *Salcido* is inapplicable to a charge of discharging a firearm at an inhabited dwelling.  *Salcido* is a murder case, and as explained by *People v. Sekona* (1994) 27 Cal.App.4th 443, 450-457), the malice required for a conviction of general intent crime (there, mayhem) was different from the "malice aforethought" required for murder.
>
> Defendant also cites a string of cases for the proposition the trial court was required to instruct the jury that defendant acted "with a

18

conscious indifference to or reckless disregard for the consequences" of his actions.  These cases do not support defendant's cause, because not one defines "maliciously" in the context of section 246.

In *People v. Chavira* (1970) 3 Cal. App.3d 988, 992-93, and *People v. Cruz* (1995) 38 Cal.App.4th 427, 431-33, the defendants argued they could not be convicted of violating section 246, because they did not shoot "at" a building.  In each case, the court concluded the evidence was sufficient to establish the intent to hit the building, because the defendant's actions were done with a reckless disregard of their probable consequences (*People v. Chavira*, *supra*, 3 Cal.App.3d at p. 993; *People v. Cruz*, *supra*, 3 Cal.App.4th at p.433).  The court in *Cruz* went a step further and concluded that section 246 does not require an intent to strike a building.  (*People v. Cruz*, *supra*, at p. 433.)  These cases concern that element of a violation of section 246 that requires a showing that a defendant unlawfully discharged a firearm at an inhabited dwelling, not that portion of the offense that requires that the act was done maliciously.  The cases on which defendant relies do not create a new definition for the term "maliciously" as used in the statute.

Defendant also directs us to *People v. White* (1992) 4 Cal.App.4th 1299.  The holding of that case is that section 246 is a crime of moral turpitude that may be used for purposes of impeachment.  *Id.* at p. 1301.)  A person who shoots into an inhabited dwelling demonstrates wanton disregard for the life of those inside of it.  (*Id.* at p. 1304.)  This case does not alter the statutory definition of "maliciously" as used in section 246.  The trial court did not err in providing the standard CALJIC instruction on malice.

(Lodged Doc. 5 at 17-19).

The appellate court clearly rejected the contention that the element of malice aforethought required for murder is identical to the statutory definition of "maliciously" as used in section 246 of the California Penal Code.[3]  The appellate court properly noted that maliciously in the context of section 246 is defined in section 7 of the California Penal Code as "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established by either proof or presumption of law."  Conversely, malice in the context of murder is defined in section 188 of the

---

[3] To the extent Petitioner's argument may be that the state appellate court's interpretation of California state law was improper, this claim is not cognizable in a federal petition for writ of *habeas corpus* because such relief is unavailable for alleged error in the interpretation of application of state law.  *Middleton*, 768 F.2d at 1085; *Givens v. Housewright*, 786 F.2d 1378, 1381 (9th Cir. 1986).

California Penal Code as "express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.  It is implied when no considerable provocation occurs, or when the circumstances attending the killing show an abandoned and malignant heart."  Accordingly, that the jury acquitted Petitioner on a murder charge, thus negating a finding of the element of malice required for murder, has no bearing on the sufficiency of the evidence supporting Petitioner's conviction for violating section 246 of the California Penal Code.  Viewing the evidence, as summarized by the appellate court and set forth above, in the light most favorable to the verdict, the court concludes that there was sufficient evidence introduced at Petitioner's trial from which a rational trier of fact could have found beyond a reasonable doubt that Petitioner acted maliciously as defined in section 7 of the California Penal Code when he willfully discharged a firearm into an occupied dwelling.  Petitioner has failed to meet the heavy burden required to demonstrate he is entitled to federal *habeas corpus* relief on this claim.

4.     JURY INSTRUCTIONS

Petitioner claims the trial court erroneously issued a jury instruction on the victim's right to defend his property, and that the trial court failed to issue jury instructions on a mistake of fact defense and on self-defense on the context of sections 246 and 12022.53(d) of the California Penal Code.  A challenge to jury instructions does not generally state a federal constitutional claim. *See Middleton*, 768 F.2d at 1085 (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).  This is because *habeas corpus* relief is unavailable for alleged error in the interpretation of state law.  *Id*. at 1381.  However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal *habeas corpus* relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process."  *Hines v. Enomoto*, 658 F.2d 667, 672 (9th Cir. 1981) (citing *Quigg v. Crist*, 616 F.2d 1107 (9th Cir. 1980)).  *See also Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988) (To prevail on such a claim, a petitioner must demonstrate that an erroneous instruction "so infected the entire trial that the resulting conviction violates due process.").  Additionally, the instruction may not be judged in artificial

20

isolation, but must be considered in the context of the instructions as a whole and the trial record. *Estelle v. McGuire*, 502 U.S. at 72.  The analysis for determining whether a trial is "so infected with unfairness" as to violate due process is similar to the analysis used in determining whether, under *Brecht v. Abrahamson*, 507 F.2d 619, 623 (1993), an error had "a substantial and injurious effect" on the trial's outcome.  *See McKinney v. Rees*, 993 F.2d 1378, 1385 (9th Cir. 1993).

a.      THE VICTIM'S RIGHT TO DEFEND HIS PROPERTY

Petitioner claims that the trial court violated his federal right to due process and his Sixth Amendment right to a jury trial by instructing the jury, pursuant to CALJIC Nos. 5.40 and 5.42, on the victim's right to defend his property because it was irrelevant and the victim was not on trial.  Petitioner argues that by giving this instruction, the trial court effectively removed his claim of self-defense from the jury's consideration.  The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim that the instruction on the victim's right to defend his property was given in error, explaining its reasoning as follows:

> Defendant argues the jury should not have been instructed concerning the defense of a dwelling.  He argues Lee's "justification for a homicide was irrelevant to the issues that were before [defendant's] jury."  Defendant says these instructions allowed jurors to presume Lee "was acting in lawful defense of his property" and "effectively removed the defense of actual self-defense from the jury's consideration."  Further, he argues that there was "no evidence that [defendant] nor anyone else attempted to forcibly enter the residence."  We disagree.

> "'The trial court functions both as a neutral arbiter between two contesting parties and as the jury's guide to the law.  This role requires that the court fully instruct the jury on the law applicable to each particular case.  "'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.'"'" (*People v. Daya* (1994) 29 Cal.App.4th 697, 712.)

> Here, in addition to the instructions that generally describe self-defense, the court instructed the jury on the defense of a dwelling, using CALJIC Nos. 5.40 and 5.42: "The lawful occupation – the

21

lawful occupant of a residence has the right to request a trespasser to leave the premises.   If the trespasser does not do so within a reasonable time, the occupant may use reasonable force to eject the trespasser. [¶] The amount of force which may be used to eject the trespasser is limited by what would appear to a reasonable person under the existing circumstances to be necessary to prevent physical injury or death to the occupant. [¶] A person may defend his home or dwelling against anyone who manifestly intends or endeavors in a violent or riotous manner, to enter that home or dwelling or who appears to – or who appears to intend violence to any person in that home or dwelling.  The amount of force which the person may use in resisting the trespass is limited by what would appear to a reasonable person in the same or similar circumstances necessary to resist the violent or unlawful entry. [¶] He is not bound to retreat even though a retreat might safely be made, he may resist force with force, increasing it in proportion to the intruder's persistence and violence if the circumstances which are apparent to the lawful occupant of the property are such as would excite similar fears and a similar belief in a reasonable person."  (CALJIC Nos. 5.40, 5.42.)

Given the facts of this case, these instructions were proper.  To be acquitted of responsibility for a person's death based on self-defense, the defendant must have acted pursuant to an actual and reasonable belief in the need to defend himself under circumstances that would lead a reasonable person to fear the imminent infliction of death, or great bodily injury. (§§ 197, 198, 199; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083.)   "The justification of self-defense requires a double-showing: that defendant was actually in fear of his life or serious bodily injury and that the conduct of the other party was such as to produce that state of mind in a reasonable person." (*People v. Sonier* (1952) 113 Cal.App.2d 277, 278.)

"Generally, if one makes a felonious assault upon another, or has created appearances justifying the other to launch a deadly counterattack in self-defense, the original assailant cannot slay his adversary in self-defense unless he has first, in good faith, declined further combat, and has fairly notified him that he has abandoned the affray." (*People v. Gleghorn* (1987) 193 Cal.App.3d 196, 201.)  In *Gleghorn*, the defendant entered the room of the victim, started beating the victim's bed with a stick and set fire to some clothes. (*Id.* at pp. 199-200.)  At that point, the victim shot an arrow at the defendant.  (*Id.* at p. 200.)   After he was convicted of assault, defendant argued on appeal he was legally justified in defending himself from the victim's deadly counterattack, because he initially committed only a simple assault.  (*Id.* at p. 201.)  The appellate court rejected this claim and concluded that, because the victim was justified in reasonably fearing for his life by the defendant's initial lethal actions and acted lawfully to defend himself, the defendant did not have the right of self-defense.  (*Id.* at p. 202.)

The *Gleghorn* court also rejected defendant's claim that the trial court

22

erred in giving CALJIC No. 5.42.  (*People v. Gleghorn*, *supra*, 193 Cal.App.3d at pp. 202-203.)  The defendant argued that CALJIC No. 5.42 is inconsistent with Penal Code section 198.5.  (*People v. Gleghorn*, *supra*, at pp.203-204.)  Section 198.5 provides in pertinent part: "Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred."  The court concluded that, just because the presumption in section 198.5 did not apply to the victim, "that does not mean that [the victim] did not have the right to defend himself against a violent attack in his own house . . . ."  (*People v. Gleghorn*, *supra*, at pp. 203-204.)  The court held that the trial court properly instructed the jury on the victim's right to defend himself.  (*Ibid*.)

In *People v. Hardin* (2000) 85 Cal.App.4th 625, the defendant ingested cocaine and became involved in an altercation with his cousin. The defendant ran into the house of a 79-year-old woman (*id.* at p. 627) and she threatened him with a hammer (*id.* at p. 631-632). When the police arrived, he hit the woman with the hammer, causing her death.  (*Id.* at pp. 627-628.)  On appeal he contends the language of CALJIC No. 5.17 is prejudicial to his claim of imperfect self-defense.  (*Id.* at p. 632.)  He reasoned that in entering the woman's house, he committed only a trespass.  She responded with deadly force.  Therefore, he reasoned, he did not forfeit his right to self-defense.  The court rejected this reasoning, because the woman was entitled to use force to evict defendant.  (*Id.* at pp. 633-634.)  Thus, defendant had a duty to retreat; the woman did not.  Her use of force was privileged; his was not.  Therefore, he was not defending himself against a criminal attempt to take his life.  (*Ibid*.)

These cases also establish that the right of a victim to defend himself and his property is a relevant consideration in determining whether a defendant may prevail when he seeks to negate malice aforethought by asserting the affirmative defense of imperfect self-defense.

Here, the jury was confronted with the question of whether defendant's use of deadly force was justified as he confronted Lee on the front porch of Lee's home and whether defendant's unlawful conduct created the circumstance that legally justified Lee's use of force.  If Lee had a right to use force to defend himself in his home, then defendant had no right of self-defense, imperfect, or otherwise.  The court's instructions on Lee's rights and defendant's right to turn to deadly force correctly stated the law.

We note too that the jury apparently credited defendant's claim of imperfect self-defense when it found defendant guilty of the lesser

offense of voluntary manslaughter.  To do so, it must have found that defendant had, or regained, the right to defend himself notwithstanding Lee's right to defend his home.  The instruction defendant complains of here ultimately did not bear on the jury's verdicts.

We cannot accept defendant's claim that there was no evidence defendant, or his cohorts, attempted forcible entry into the residence.  Both defendant and Williams testified Williams tried to open the security door to get into the house.  Williams threatened and challenged Lee repeatedly through the security door, as the three men stood on [Lee's] porch.  Moreover, defendant was guilty of trespass and was threatening Lee whether defendant was attempting to break into the house or not.  There was no error in the challenged instructions.

(Lodged Doc. 5 at 11-16).

The burden of demonstrating that an allegedly erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal."  *See Hanna v. Riveland*, 87 F.3d 1034, 1039 (9th Cir. 1996).  Here, it cannot be said that the challenged instruction given by the trial court was an error that had a "substantial and injurious effect" on the outcome of Petitioner's trial, or that the challenged instruction was "so infected with unfairness" such that his resulting conviction violates due process.  As noted by the appellate court, under California law, whether Petitioner's use of deadly force was justified by his belief in the need to defend himself was directly relevant to the victim's right to defend his property.  Moreover, contrary to Petitioner's assertion, it is evident that the jury did consider and credit Petitioner's claim of self-defense by acquitting him of the murder charges and instead finding him guilty of the lesser included offense of voluntary manslaughter.  Accordingly, the appellate court's decision finding no prejudicial error based upon the given jury instruction was neither contrary to nor involved an unreasonable application of clearly established federal law.  Petitioner is not entitled to federal *habeas corpus* relief on this claim.

b.      MISTAKE OF FACT

Petitioner claims that the trial court violated his federal right to due process and his

24

Sixth Amendment rights by failing to *sua sponte* instruct the jury on the defense of mistake of fact as it related to the charge of discharging a firearm into an inhabited dwelling.

Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479 (1984). Therefore, a criminal defendant is entitled to adequate instructions on the defense theory of his case. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (holding that it was error to deny defendant's request for instruction on simple kidnaping where such instruction was supported by the evidence). This right is limited to situations where "the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." *United States v. Boulware*, 558 F.3f 971, 974 (9th Cir. 2009). Moreover, while a defendant is entitled to adequate instructions on the defense theory of the case, *see Conde*, 198 F.3d at 739, he is not entitled to have instructions prepared in his precise terms where the other instructions given sufficiently embody the defense theory. Where, as here, the challenge is to a failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997). In order to prevail upon a claim that the trial court failed to give an instruction, Petitioner must demonstrate that the alleged failure had a "substantial and injurious effect" on the outcome of his trial. In other words, Petitioner is required to show that there is a "reasonable probability" that, had the instruction been given, the jury would have reached a different verdict. *Clark v. Brown*, 450 F.3d 898, 916 (9th Cir. 2006).

The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on the merits, explaining its reasoning as follows:

> Defendant argues the trial court, on its own motion, should have given the "mistake of fact [CALJIC No. 4.35] instruction [ ] . . . with respect to the charge of shooting into an inhabited dwelling. We disagree.

In addition to its general duty to instruct on the law, the court "'has the correlative duty to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." [Citation.]'" (*People v. Barker* (2001) 91 Cal.App.4th 1166, 1172.)

CALJIC No. 4.35 provides: "An act committed or an omission made in ignorance or by reason of a mistake of fact which disproves any criminal intent is not a crime. [¶] Thus a person is not guilty of a crime if [he] [she] commits an act or omits to act under an actual [and unreasonable] belief in the existence of certain facts and circumstances which, if true, would make the act or omission lawful." As applied to the facts of this case, this instruction would have been confusing and misleading.

Even if defendant had been reasonably mistaken about the fact Lee had a gun, that mistake alone would not have relieved him of criminal liability. The instructions given to the jury in connection with the murder charge and the instructions on self-defense and imperfect self-defense required the jury to consider and resolve defendant's claims of mistake of fact. The impact of the defendant's actual and reasonable belief, even if it was mistaken, was fully described by CALJIC Nos. 5.12, 5.13, 5.30, and 5.51. The jury rejected defendant's proffered "reasonable" mistake concerning his need to defend himself. An unreasonable mistake provided him with no defense to the section 246 charge. The court, thus, had no *sua sponte* duty to provide a separate mistake-of-fact instruction.

(Lodged Doc. 5 at 23-24).

Petitioner has failed to meet the "heavy burden" of demonstrating that the trial court's failure to instruct *sua sponte* on a mistake of fact defense pursuant to CALJIC 4.35 so infected his trial that the resulting conviction violates due process. *Estelle v. McGuire*, 502 U.S. at 72-73. As explained by the California Court of Appeal, the trial court correctly instructed the jury regarding self-defense and imperfect self-defense, and these instructions required the jury to resolve whether defendant was mistaken, reasonably or unreasonably, with regard to the need to defend himself. The jury acquitted Petitioner of the murder charges, instead finding him guilty of the lesser included offense of voluntary manslaughter. In so acquitting Petitioner, the jury found that Petitioner held a good faith, yet unreasonable, belief in the need to defend himself. Because mistake of fact is only a defense to a general intent crime, such as a violation of section 246, insofar as that mistake was

reasonable, it is unlikely that the outcome of Petitioner's trial would have been different had the jury

been instructed on the mistake of fact defense.  As such, Petitioner has failed to demonstrate that the

"alleged instructional error had substantial and injurious effect or influence in determining the jury's

verdict."  *Clark*, 450, F.3d at 905.  Moreover, the state appellate court's opinion on the merits of

Petitioner's claim is not contrary to or an unreasonable application of clearly established federal law.

Petitioner, therefore, is not entitled to *habeas corpus* relief on this claim.

> c.   SELF-DEFENSE IN THE CONTEXT OF SECTIONS 246 AND
>      12022.53 OF THE CALIFORNIA PENAL CODE

Petitioner claims that the trial court violated his federal right to due process as well

as his Sixth Amendment rights by failing to issue a jury instruction on self-defense with regard to

the charged offense of discharging a firearm into a dwelling, CAL. PENAL CODE § 246, and the

corresponding penalty enhancement for personally and intentionally discharging a firearm in the

commission of the § 246 offense and causing a death, CAL. PENAL CODE § 12022.53(d).  As

previously discussed, a claim that a state court violated a federal habeas petitioner's due process

rights by omitting a jury instruction requires a showing that the error so infected the entire trial that

the resulting conviction violated due process.  *Henderson v. Kibbe,* 431 U.S. 145, 155 (1977);

*Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).  Additionally, a petitioner claiming error

in failing to give a specific jury instruction bears an especially heavy burden.  *Henderson*, 431 U.S.

at 155.

The California Court of Appeals, Third Appellate District, considered and rejected

both of Petitioner's failure to instruct claims on the merits, explaining its reasoning as follows:

> Defendant argues the court erred in failing to give the last paragraph
> of CALJIC No. 9.03.3, which reads as follows:  "[The willful
> discharge of a firearm is not unlawful when done in lawful [self-
> defense] [or] [defense of others].  The People have the burden to
> prove that the discharge of the firearm was not in lawful [self-
> defense] [or] [defense of others].  If you have a reasonable doubt that
> the discharge of the firearm was unlawful, you must find defendant
> not guilty.]"  Defendant argues the court had a *sua sponte* duty to
> give this part of the instruction, because the defense amounts to a
> claim that "'defendant acted without forming the mental state

27

necessary to make his or her actions a crime.'"

For the sake of our analysis, we shall assume defendant's claim that the court should have given the last paragraph of CALJIC No. 9.03.3 is correct. Based on this record, and for the reasons that follow, we conclude that any error in failing to instruct the jury on self-defense, as it related to the section 246 offense, was harmless beyond a reasonable doubt, that is "the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [124 L.Ed.2d 182, 189].)

*1. Lawful self-defense*

The jury rejected defendant's claim of perfect, or lawful, self-defense. The jury, after receiving appropriate jury instructions on perfect and imperfect self-defense as those defenses related to the charge of second degree murder, concluded that defendant was guilty of voluntary manslaughter. Had they found that he had acted in perfect self-defense, they would not have found him guilty of voluntary manslaughter.

The identical facts giving rise to the murder charge form the factual basis for the section 246 charge. We have assumed for the sake of argument that, even if the instruction had been given on identical facts, this jury could not have convicted defendant of voluntary manslaughter, necessarily rejecting his claim of self-defense, and then, by accepting the defense, acquit him of the section 246 charge. Thus, the failure to specifically point out that the instructions on perfect self-defense applied to the section 246 charge was harmless beyond a reasonable doubt.

*2. Imperfect self-defense*

Defendant contends the court should have instructed *sua sponte* regarding the so-called "defense" of imperfect self-defense with respect to the section 246 charge. We shall conclude the court had no *sua sponte* duty to so instruct.

"It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case" (*People v. St. Martin* (1970) 1 Cal.3d 524, 531, quoted in *People v. Breverman* (1998) 19 Cal.4th 1027, 1047.)

However, "the court's obligation to instruct *sua sponte* extends only to those general principles of law 'closely and openly connected with the facts before the court.'" (*People v. Guzman* (1988) 45 Cal.3d 915, 952.)

28

"[A] legal concept that has been referred to only infrequently, and then with 'inadequate elucidation,' cannot be considered a general principle of law such that a trial court must include it within jury instructions in the absence of a request. (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 126; *People v. Sekona*, *supra*, 27 Cal.App.4th at p.451.)

Defendant's contention that the court had a *sua sponte* duty to instruct on the so-called "defense" of imperfect self-defense, with respect to the section 246 charge, falters, because, as our Supreme Court has made clear, "contrary to the statement in [*People v. Wickersham* (1982) 32 Cal.3d 307, 329] 'unreasonable self-defense' is . . . not a true defense; rather it is a shorthand description of one form of voluntary manslaughter. And voluntary manslaughter, whether it arises from unreasonable self-defense or from a killing during a sudden quarrel or heat of passion, is not a defense but a crime; more precisely, it is a lesser offense included in the crime of murder. Accordingly, when a defendant is charged with murder the trial court's duty to instruct *sua sponte*, or on its own initiative, on unreasonable self-defense is the same as its duty to instruct on any other lesser included offense: this duty arises whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense. [¶] We therefore disapprove *Wickersham's* inaccurate assertion that 'unreasonable self-defense' is a 'defense.' (*Wickersham*, *supra*, 32 Cal.3d at p.329.)"

 (*People v. Barton* (1995) (12 Cal.4th 186, 200-201.)

At the time of trial, as now, there was no authority suggested that the non-defense of imperfect, or unreasonable, self-defense could apply in a prosecution for violation of section 246. Such a legal theory would be at odds with *Barton's* characterization of unreasonable self-defense as a species of voluntary manslaughter. Because there was no authority supporting application of unreasonable self-defense to a prosecution for violation of section 246, that theory of defense could not be considered "a general principle of law" that was "openly connected with the facts before the court," and the trial court had no duty to instruct on that theory *sua sponte*. (*People v. Bacigalupo*, *supra*, 1 Cal.4th at p. 126.) Defendant's contention that the trial court had such a *sua sponte* duty to instruct is without merit.

(Lodged Doc. 5 at 19-23).

Defendant [also] argues the lack of a specific instruction that perfect self-defense is a defense to the enhancement and that the prosecution was required to prove he did not act in self-defense requires reversal. Again, we disagree.

> The jury rejected defendant's claim of perfect self-defense. If it had not, defendant would have been acquitted of all charges and the enhancement by necessity would not have applied. Thus, any instructional error on the point was harmless beyond a reasonable doubt.

(Lodged Doc. 5 at 28-29).

A criminal defendant is indeed entitled to instructions on his theory of defense. On review, however, Petitioner has failed to show a reasonable probability that, had an instruction been given on self-defense in the context of the section 246 charge or the section 12022.53 penalty enhancement, the jury would have reached a different verdict. *Clark*, 450 F.3d at 916. The appellate court correctly concluded that any alleged error in failing to give such instructions was harmless. As noted by the appellate court, a jury instruction on both perfect and imperfect self-defense was given in Petitioner's trial on the murder charge, and the jury rejected Petitioner's claim of perfect self-defense. Both the murder charge and the section 246 charge were based on identical underlying facts, thus demonstrating that it is not reasonably probable that the jury would have rejected Petitioner's claim of perfect self-defense on the murder charge while simultaneously accepting that same claim on the section 246 charge. Moreover, although the appellate court concluded that an instruction on imperfect self-defense was inapplicable to the section 246 charge, Petitioner does not now contend that such an instruction was required.

Petitioner has not demonstrated that, had a perfect self-defense instruction been given, the outcome of his trial would have been different. The appellate court's finding that the alleged failure to give the instruction amounted to no more than harmless error is not contrary to or an unreasonable application of clearly established federal law. Petitioner has failed to meet the heavy burden requiring him to demonstrate that the trial court's alleged error so infected his trial that his conviction violates due process. Petitioner is not entitled to federal *habeas corpus* relief on this claim.

5.    CALIFORNIA PENAL CODE § 12022.53(d) AND IMPERFECT SELF-DEFENSE

Petitioner claims that the California Legislature did not intend for CAL. PENAL § 12022.53(d) to apply in cases where a jury finds a defendant acted in imperfect self-defense and convicts him of voluntary manslaughter, a crime from which malice is necessarily absent.

In the absence of a miscarriage of justice, federal *habeas corpus* relief is generally unavailable for alleged errors in the interpretation or application of state sentencing laws by either a state trial or appellate court. *Hill v. United States*, 368 U.S. 424, 428 (1962); *Middleton*, 768 F.2d 1083, 1085 (9th Cir. 1985). Moreover, as discussed above in section V(1), the California Court of Appeal determined that the California Legislature did, in fact, intend for a penalty enhancement under section 12022.53 of the California Penal Code to apply in cases where a section 246 offense is committed in imperfect self-defense. To the extent that Petitioner now alleges the appellate court's interpretation of section 12022.53 was incorrect, "[a]bsent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal *habeas* relief." *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994). *See also, e.g., Miller v. Vasquez*, 868 F.2d 1116 (9th Cir. 1989). "[I]t is not the province of a federal *habeas* court to reexamine state court determinations on state law questions." *Estelle*, 502 U.S. at 65. Accordingly, Petitioner's claim is not cognizible for federal *habeas corpus* relief because it lacks merit and is based solely on the interpretation and application of state law.

6.     INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Petitioner claims that his appellate counsel was ineffective for failing to challenge or exhaust on appeal several alleged errors committed at trial. Specifically, Petitioner contends that appellate counsel was ineffective for failing to exhaust his claims that (1) his conviction under section 246 of the California Penal Code was supported by insufficient evidence; (2) the trial court violated his due process rights by instructing the jury on the victim's right to defense of his property; and (3) the trial court violated his due process and Sixth Amendment rights by failing to instruct the jury regarding a mistake of fact defense.

The Sixth Amendment guarantees the effective assistance of counsel. The United

States Supreme Court set forth the test for determining whether counsel's assistance was ineffective in *Strickland v. Washington*, 466 U.S. 668 (1984). To support such an ineffectiveness claim, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *Id* at 687-88. After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 693-694. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id*. *See also Williams v. Taylor*, 529 U.S. 362, 391-92 (2000); *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at 697). In assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). There is, in addition, a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S. at 689).

The *Strickland* standards apply to appellate counsel as well as trial counsel. *Smith v. Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment,

decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). "Counsel must be allowed to decide what issues are to be pressed." *Id*. Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined." *Id*. *See also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (Counsel was not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy."). There is, of course, no obligation to raise meritless arguments on a client's behalf. *See Strickland*, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice). Thus, counsel is not deficient for failing to raise a weak issue. *See Miller*, 882 F.2d at 1434. In order to demonstrate prejudice in the appellate context, Petitioner must show that, but for appellate counsel's errors, he would likely have prevailed on appeal.

The merits of each of the three individual claims forming the basis for Petitioner's ineffective assistance of counsel claim have been discussed and rejected in the above opinion. Because the claims are without merit, appellate counsel's decision not to exhaust or raise these claims on appeal did not fall outside the bounds of reasonably competent professional assistance, nor did Petitioner suffered any prejudice as a result of counsel's alleged errors. In other words, Petitioner has failed to prove that, but for appellate counsel's alleged errors, any of the three claims would have, in fact, been successful on appeal. Petitioner is not entitled to *habeas corpus* relief on his ineffective assistance of counsel claim.

### 7. AEDPA VIOLATES THE SEPARATION OF POWERS DOCTRINE

In his traverse, Petitioner raises a new claim that AEDPA violates the separation of powers doctrine. A traverse is an improper pleading by which to raise new grounds for relief. The Ninth Circuit has held that "in order for the State to be properly advised of additional claims, they should be presented in an amended petition, or . . . in a statement of additional grounds. Then the State can answer and the action can proceed." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (citing *King v. Rowland*, 977 F.2d 1354, 1357 (9th Cir. 1992). Accordingly, the court does not address the new claim mentioned by Petitioner for the first time in his traverse.

VI.     CONCLUSION

IT IS RECOMMENDED that Petitioner's petition for writ of *habeas corpus* be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: August 10, 2010

*Charlene H. Sorrentino*

CHARLENE H. SORRENTINO
UNITED STATES DISTRICT COURT